P4L4GLOC

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  GLOBAL WEATHER PRODUCTIONS,

4                    Plaintiff,

5           v.                              24 Civ. 507 (SA)

6  REUTERS NEWS & MEDIA, INC. *et*
   *al*,

7                                           Conference

8                    Defendants.

9  ------------------------------x
                                            New York, N.Y.
10                                          April 21, 2025
                                            2:20 p.m.
11
   Before:
12
                        HON. ARUN SUBRAMANIAN,
13
                                            District Judge
14
                          APPEARANCES
15
   SANDERS LAW GROUP
16      Attorneys for Plaintiff
   BY:  RENEE ARAGONA
17      CRAIG SANDERS

18  DAVIS WRIGHT TREMAINE LLP
        Attorneys for Defendants
19  BY:  JEREMEY CHASE
        RAPHAEL HOLOSZYC-PIMENTEL
20

21  ALSO PRESENT:   Michael Clement
                    Chris Lee
22

23

24

25

P4L4GLOC

1              (Case called)

2              MS. ARAGONA:  Good afternoon, your Honor.  Renee

3    Aragona, Sanders Law Group for plaintiff.  With me is Craig

4    Sanders from the firm as well, and the representative from

5    plaintiff, Global Weather Productions, Michael Brandon Clement.

6              THE COURT:  Good afternoon.

7              MR. CHASE:  Good afternoon, your Honor, Jeremy Chase

8    from Davis Wright Tremaine on behalf of defendants, Reuters

9    News & Media Inc., and Thomson Reuters U.S. LLC.  With me is my

10   co-counsel, Raphael Holoszyc-Pimentel also from Davis Wright

11   Tremaine and Christopher Lee from Reuters.

12             THE COURT:  Good afternoon.

13             There are two purposes for the hearing today, one of

14   which is to figure out if there's a way to have the parties

15   resolve their issues in this case and, if possible, the related

16   case.  I say "related" in the sense that they are the same

17   parties, although I understand the underlying material is

18   different, but the related case in that context of 24-CV-7828.

19             The second purpose is to figure out where we are in

20   terms of any additional discovery that's necessary and deal

21   with the pending motions.

22             I want to deal, first, with the issue of a possible

23   resolution.  Since I've advised the parties to have discussions

24   here, the question I have, which I may not have raised

25   previously, and you'll let me know if I raised this previously,

P4L4GLOC

1   is whether the parties are interested and prepared to have *ex*

2   *parte* communications with the Court to see if there is a way

3   that the Court can help the parties break any impasse and see

4   if there is a settlement that's possible in this case.

5          So first of all, let me ask, Ms. Aragona, have I

6   previously advised the parties of this potential opportunity?

7          MS. ARAGONA:  Yes, I believe you did, your Honor.

8          THE COURT:  Without telling me what the answer is,

9   because that's important because I don't want to prejudice

10  anyone, I don't want to have anyone say they have been treated

11  unfairly by the Court, have the parties discussed with each

12  other whether they would be amenable to that kind of discussion

13  with the Court?

14         MS. ARAGONA:  There was a letter motion by the

15  defendants requesting a settlement conference back in September

16  which we had opposed.  So we haven't really discussed it since

17  then I think because of the distance that the parties are in

18  their numbers.

19         THE COURT:  Understood.

20         So let me do it this way, Mr. Chase --

21         MR. CHASE:  Yes, your Honor.

22         THE COURT:  -- are you the head honcho on the defense

23  side?

24         MR. CHASE:  I wouldn't go that far, but I will be

25  speaking today.

P4L4GLOC

```
1              THE COURT:  Could you and Ms. Aragona, please, you can

2      even just go into the back of the courtroom.  You can go into

3      the hallway, into the jury room, and talk with each other as to

4      whether you would be interested in having *ex parte*

5      communications with the Court in an attempt to resolve this

6      action, 24-CV-507, but also potentially the related case.  If

7      the answer is yes, then can you come back and tell me yes.

8      We'll get that on the record and then we will proceed.  If the

9      answer is no, don't tell me who was not interested in having

10     those discussions.  Just tell me -- you can have a

11     spokesperson -- just tell me the answer is no, and we can see

12     what else we can usefully do today.  Although, hopefully, there

13     has been some use already since the parties came in an hour ago

14     to have some discussions.

15              Does that make sense?

16              MR. CHASE:  Yes, your Honor.

17              THE COURT:  So Ms. Aragona, Mr. Chase, take a second

18     and have those discussions, and you can come back.

19              (Discussion off the record)

20              THE COURT:  Ms. Aragona, maybe you can be the

21     spokesperson for the group.

22              MS. ARAGONA:  Yes, your Honor.  At this time, the

23     parties are not looking for an *ex parte* settlement conference.

24     I think we need to see what the next step is along the way in

25     the action.
```

P4L4GLOC

1          THE COURT:  All right.  Why don't you let me know and

2     that's fine.

3          Let's go off the record for just a second.

4          (Discussion off the record)

5          THE COURT:  Let's go back on the record.

6          Ms. Aragona, what can we do here today?  What are the

7     issues that you think we need to handle at today's conference?

8          MS. ARAGONA:  Thank you, your Honor.

9          Yes, you know, I think the settlement is related to

10    what the discovery issue that we raised in our letter is.

11    Because we have -- we've requested a distribution list of the

12    videos that are at issue in this action.  We've received three

13    separate lists so far, through discovery, discovery closed, and

14    now recently plaintiff has discovered that an edit that

15    contains six of his videos that was produced by Reuters was

16    still being displayed on a third-party website, Pond5, which

17    also seems to be a licensing agency.  And in response, Reuters

18    advised that they are -- that there was a third edit also on

19    Pond5 and also on the defendant's own website, Reuters Connect.

20    In their opposition, as well, as they listed that the third

21    edit was distributed to another 190 entities, downloaded by 18

22    customers.  And I think there was one download from the Pond5

23    website.  This is the issue that we're having because when

24    trying to calculate actual damages, there's just been this

25    moving target of how many people, how many entities has

P4L4GLOC

1    plaintiff's videos gone to?  And we feel that our discovery

2    demands were clear.

3         I think in the opposition, the defendants' point to

4    one of the discovery requests, but I think they ignore many of

5    the others that would cover whether there was a third edit of

6    Mr. Clement's videos and plaintiff's videos.  At this point we

7    don't know if there are four edits or five edits.  Pond5 itself

8    was not listed on any of these download or distribution lists

9    that were produced.  So it just didn't seem -- it seemed very

10   unlikely that that's not something that should have been

11   produced during discovery.

12        THE COURT:  Putting the Pond5 edit to the side, what

13   was the Rule 26 calculation of damages that you submitted to

14   the defendants or what evidence did you put in?  What was your

15   number that you gave to the defendants as to your compensable

16   damages here?

17        MS. ARAGONA:  For this case involving the snowstorm

18   videos, we totaled up all of the entities that were produced in

19   these lists, including in their letter there was the additional

20   190 entities.  The total that they produced to us is 1,275

21   entities.  There are six videos involved that are contained

22   within these edits.  And plaintiff has produced during

23   discovery that his videos were available, offered for licensing

24   between $500 to $1,000 per video.  So we took a calculation of

25   the six videos, times $1,000 for actual licensing, times the

P4L4GLOC

1    1,275.  So I believe that equals 7.65 million in lost

2    licensing.

3          And then separately, plaintiff reserves the right for

4    statutory damages.  And I believe there is a seventh video in

5    the action that was also part of a third-party's edit.  It was

6    on defendant's website.  So we took the maximum 150,000 in

7    statutory damages multiplied by seven.

8          THE COURT:  And then in the other action, did you turn

9    over a Rule 26 damages calculation?

10         MS. ARAGONA:  Yes, on Friday.  In that action, that

11   involves just one video of the hurricane, plaintiff has

12   licensing for 3,500 to 4,000 for videos of that event, but the

13   specific video at issue in that action was licensed for 3,500.

14   So the actual damage was listed as 3,500 -- and I forgot to

15   mention, for the blizzard action plus disgorgement of profits

16   to be determined, and then for statutory damage in the

17   hurricane action, also willful max 150,000.

18         THE COURT:  All right.  So what are you looking for

19   here with respect to the Pond5 usage of the edit?

20         MS. ARAGONA:  Well, I think it goes towards

21   willfulness.

22         THE COURT:  What are you asking for?  My understanding

23   is that Reuters has turned over everything that they have, but

24   is there something else that you are asking for?

25         MS. ARAGONA:  We haven't received any documents

P4L4GLOC

1    related to what happened with Pond5, aside from what's written

2    in the letter in opposition.  We don't know -- they're stating

3    that it was licensed to Pond5 to only one entity.  We don't

4    know who that entity is.  They are stating that the third edit

5    was on ReutersConnect.com and distributed to 190 entities.  We

6    don't know who those entities are.  We never received that

7    list.  We just don't know what kind of searches were done

8    during discovery.  We don't have the agreement between Reuters

9    and Pond5.  We don't know the name of the Reuters employee who

10   produced that third video edit, who uploaded it to Pond5, who

11   uploaded it to Reuters Connect.  When were they uploaded to

12   Pond5?  Because, you know, the timeframe here is that third

13   video edit is basically a compilation of severe weather events

14   that occurred from the December 2022 through March 2023 period.

15           And in defendants' letter they stated that it was, I

16   believe they state it was first uploaded in May of 2023.  But

17   in prior submissions to the Court, defendant advised that they

18   were aware of plaintiff's claims through an action commenced

19   against the licensee.  It was Global Weather v. Nexstar, and I

20   think they were aware of the claim in May of 2023.  So

21   depending on the exact timing of when this edit was created,

22   when it was uploaded, when did Reuters actually know?  I think

23   that all goes to whether or not defendants acted willfully or

24   innocently.

25           THE COURT:  Mr. Chase, I understand in your letter

P4L4GLOC

1    response you identify the information that you currently have

2    concerning Pond5.  Have you searched for any documents

3    concerning this edit and Pond5?

4            MR. CHASE:  Yes.  In order to make the representations

5    that we made to the Court, we did conduct some searches.  And I

6    believe we do have some documents which we can produce, if need

7    be, that would support those representations.

8            Your Honor, may I respond to some of the points by

9    Ms. Aragona?

10           THE COURT:  Help me understand this in a simple way,

11   which is, tell me what was Pond5 doing?

12           MR. CHASE:  So we have said from the start, your

13   Honor, and I believe we even said this to you in September when

14   we had that conference that Ms. Aragona was referencing.

15   Reuters doesn't have the means to create a perfect distribution

16   list of every single person who received a particular video.

17   We know exactly how many people downloaded the video from

18   Reuters Connect, but Reuters also distributes content in a

19   number of ways.  So we've compiled the download lists of each

20   of the two edits, the "once in a lifetime" edit and "traffic

21   chaos" edit downloads from Reuters Connect, and each had a

22   number of distribution lists that it would automatically push

23   content to.  The problem is those distribution lists aren't

24   timestamped.  They're just up to date.  So we have to do a lot

25   of recreation and pulling from different places in order to

P4L4GLOC

1    compile our lists.  So the lists were never perfect.  We never

2    represented they were perfect.

3         With respect to Pond5, we missed it.  I don't have any

4    other answer for you than that.  The distribution list that we

5    provided contained over 600 entities and individuals, and one

6    apparently did not end up on the list.  So I don't have a good

7    answer as to how it got missed, but it just did get missed.

8         THE COURT:  All right.  And what documents do you have

9    that you could turn over relating to Pond5, meaning, you've

10   done an investigation so you have documents that have turned

11   up?  What are we talking about here?

12        MR. CHASE:  So we have, initially -- with respect to

13   Pond5, we've reached out to Pond5 and obtained who, if anyone,

14   downloaded it, and we confirmed there was one individual who

15   downloaded it, I should say, the "once in a lifetime" edit.

16   The third edit, no one downloaded.  It was just on Pond5 on its

17   own.

18        With respect to Reuters Connect, we were able to

19   collect a download report from Reuters Connect of the timeline

20   edit, this third that just came up.  And we can produce exactly

21   who downloaded it, which was 18 entities.  Separately, we were

22   able to pull -- of course, because Reuters has many

23   distribution methods -- the push list is a different group of

24   entities for this timeline edit for one reason or another.  So

25   we were able to pull the list of entities that are currently

P4L4GLOC

1  subscribed to those particular push "Listservs" I guess is a

2  way to think of it.  That's not exactly what it is, but for our

3  purposes that's probably how we'd conceptualize it.  So we

4  would be ready and willing to produce that as well.

5       With Pond5 we also do have their distribution

6  agreement with Reuters.  We don't think we have it with us here

7  today, but we could produce that as well.  And we also have the

8  invoice of the one individual who downloaded it from Pond5 as

9  well.  So that's -- in short order, it was a lot of work to

10  compile all of this, your Honor, but we were able to pull all

11  of this together within a few days.

12       THE COURT:  And there is no issue turning it over to

13  the plaintiff here?

14       MR. CHASE:  We would prefer to Bates stamp it, but

15  would be more than happy to provide that.

16       THE COURT:  Turn the information over.

17       To the extent, Ms. Aragona, that you have any

18  reasonable follow up based on the production of that

19  information, ask your questions, Mr. Chase will respond.  If

20  there is a dispute for the Court to address, we'll address it.

21       I don't think we need to formally reopen discovery.  I

22  think this is just -- sometimes this happens.  There is

23  additional information that comes up.

24       But, Ms. Aragona, if you get the information and then

25  there is a real issue that you see in the documents that shows

P4L4GLOC

1    a real basis for a broader reopening the discovery, then you

2    can certainly bring that issue to the Court, and we will

3    consider it, along with the other information.

4        MS. ARAGONA:  Your Honor, as part of that I think we

5    would want to subpoena Pond5 for information as well.  Just to

6    get it from -- to get records directly from them, if that's --

7        THE COURT:  Mr. Chase, based on your discussions with

8    Pond5, is that going to pose any issue?  Meaning, do we have to

9    go the subpoena route, or would Pond5 produce voluntarily the

10   information to Ms. Aragona so that you don't have to go through

11   all the headaches of a subpoena and any potential motion

12   practice or anything else.  What's your sense of things,

13   understanding that you are not here standing up for Pond5?

14       MR. CHASE:  Of course, your Honor, I can represent to

15   you that the invoice I have in my hands right here was provided

16   to us from Pond5 when we requested this information from them.

17   So any information that we receive from Pond5 would be

18   completely duplicative of what we are going to provide them

19   here.  Pond5, they distributed to one entity, or one

20   individual, I should say.  So I think it's a bit unnecessary.

21       THE COURT:  I understand.

22       Ms. Aragona, what I would do, I would reach out to

23   Pond5.  I would apprise them of what has happened and the

24   pendency of this case.  Ask them to turn over the information

25   that you're looking for.  If you need to subpoena them, you are

P4L4GLOC

1    authorized to subpoena them.  But we should be reasonable in

2    how we approach this, given the scope of what we are talking

3    about, if that makes sense.  And if there is a dispute about

4    it, I will handle it.

5            MS. ARAGONA:  Thank you, your Honor.

6            THE COURT:  Now, what, Mr. Chase, in your view, and

7    right now we're talking about the 507 case, what is the

8    critical portion?  You think everything is critical in your

9    motion, but what's the critical aspect of your motion on

10   summary judgment that if I look at everything -- I literally

11   look at every single case, every single piece of evidence --

12   but if I was really going to focus on one particular thing,

13   from your perspective, it's this -- forget everything else,

14   focus on this piece?

15           And Ms. Aragona, I'm going to ask you the same

16   question on this side.

17           MR. CHASE:  You have to forgive me.  I know every

18   lawyer has to do this, your Honor.  But really there are two

19   things.

20           THE COURT:  That's okay.

21           MR. CHASE:  Number one, is their actual damages are

22   completely untethered from reality here.  And points one

23   through three of our brief really go to that exact point.  This

24   is a situation where the plaintiff licensed -- there are seven

25   videos at issue here, your Honor.  One of them was licensed

P4L4GLOC

1    twice.  Mr. Clement, I guess it was Mr. Clement at the time

2    before Global Weather was founded, his share of those licenses

3    was $175 each.  That's what we're talking about here.  The

4    damages figure -- this morning at 9:00 a.m. for the first time

5    we received a damages computation from the plaintiffs.  Their

6    damages computations are over $7 million.  It's just wildly

7    disproportionate.  There are multiple holes that we can poke in

8    it.  I know you asked for two points, I'm going to get to the

9    second one, and I'm happy to discuss them at length.  But

10   simply there is nothing that is remotely within the realm of

11   reality, $7 million for what we're talking about here.

12        The second point is that Reuters acted innocently

13   here.  Reuters obtained these videos via license from Stringer.

14   And Stringer -- it also received it from -- Lana also uploaded

15   it to Reuters Connect, but there was no distribution.  It was

16   really just a technical infringement there.

17        Stringer is the main individual that licensed to us

18   and where most of the distribution flowed from.  Stringer in

19   its seven-year history had never once had a copyright

20   infringement issue.  They work with many different publishers,

21   CNN, Getty Images, they've worked with AP at various times.

22   They've never had a copyright infringement issue.  They repped

23   and warranted that everything that was provided to us was free

24   and clear of any copyright issue.  It got distributed.  We

25   pulled it from the Stringer website.  It turns out though, that

P4L4GLOC

1    the person who uploaded to Stringer didn't own the videos.  It

2    happened to be plaintiff's videos.  We don't deny that.  We are

3    not contesting testing liability here.  But what we did was

4    purely innocent.  We were relying on our partner who does their

5    own vetting who never had a copyright infringement issue.  It

6    just so happens that this was the unicorn event, so to speak.

7              THE COURT:  You would agree that in most instances

8    willfulness or bad faith are issues that usually go to the fact

9    finder and are not amenable to a resolution on a motion for

10   summary judgment; right?  This may be the unicorn case where

11   that is not true, but that is typically how things are handled;

12   right?

13             MR. CHASE:  Typically, yes.  However, where there are

14   reps and warranties that the infringer relied upon reasonably,

15   which we absolutely did here, courts have granted summary

16   judgment in those circumstances.  For example, in the Second

17   Circuit in the *Bryant v. Media Rights* case, that's an example

18   where there the Second Circuit held that the music platform,

19   Orchard acted innocently, not just without willfulness, when it

20   relied on a broad license to distribute and rep and warranty of

21   noninfringement with an agreement with a music label in

22   distributing digital copies of plaintiff's albums.

23             MyWebGrocer case this, is out of the District of

24   Vermont in 2019.  Applying *Bryant* on summary judgment found

25   that the defendants acted innocently, not just without

P4L4GLOC

1   willfulness on the grounds that they relied on reps and

2   warranties.

3           Again, willfulness, generally speaking, is a question

4   for the fact finder.  But where there are reps and warranties,

5   courts have found not only that it wasn't willful but that it

6   was innocent as well.

7           THE COURT:  Okay.  I apologize in advance for asking

8   this question, but could you walk me through -- so on a motion

9   for summary judgment relating to damages, you are looking at

10  the evidence in the light most favorable to Global Weather;

11  right?  And then you are saying that even if you take all those

12  facts in their favor, there is a maximum amount of possible

13  damages here that is much less than what they're seeking.  Is

14  that fair?

15          MR. CHASE:  Yes.  And I would go even further and say

16  that until 9:00 a.m. this morning, we did not know what they

17  were seeking in damages.

18          THE COURT:  Let's put that issue and the untimely

19  disclosure of a damages calculation to the side just a moment.

20          From your perspective, could you walk me through the

21  damages calculation as you understand it based on the

22  prevailing law in this circuit?  In your view, when we are

23  thinking about what damages has to be as a matter of law

24  cabined to, based on the law that is applicable here, what does

25  that look like mapped on to the facts of this case?

P4L4GLOC

1          And I'm going to ask Ms. Aragona to respond to that

2    based on what she already told us.

3          MR. CHASE:  Speaking strictly to the actual damages

4    right now?

5          THE COURT:  Yes.

6          MR. CHASE:  In the normal course, if the plaintiff had

7    produced evidence of what a reasonable license fee would be,

8    here, the plaintiff is, our understanding, and I think at this

9    point is pretty much accepted, and Ms. Aragona can correct me

10   if I'm wrong, they are seeking lost sales.  In the lost sales

11   context, the plaintiff would need to establish that there was a

12   nonspeculative basis for the idea that they would have made the

13   sales at issue.

14         THE COURT:  Meaning when they say $7 million, they

15   have to show that there is a nonspeculative basis that they

16   would have made $7 million?

17         MR. CHASE:  Exactly, your Honor.

18         THE COURT:  Okay.

19         MR. CHASE:  The plaintiffs rely a great deal on the

20   *Morel* case which was decided by Judge Nathan.  I believe it was

21   Judge Nathan about 12 years ago.  That case seems to be the

22   basis for their claim here which is that there, Morel, the only

23   photographer in Haiti when the earthquake hit Haiti.  He took a

24   number of photographs.  He then posted it online.  Someone else

25   took those photographs, put them on their own Twitter account

P4L4GLOC

1   and then gave AFP and I believe Getty Images permission to then

2   use those photos.  That second person didn't have the right to

3   do it.  Those licenses went out, and it got distributed to

4   1,000-plus people or entities.

5            In that case, one, he was the only person there.  But

6   more importantly, it was right as the news was breaking.  In

7   that circumstance, everyone wanted photos of the Haiti

8   earthquake, and they were able to get it.  And the Court

9   allowed an actual damages award per downstream use.  That's

10  what plaintiff is relying on, mainly.

11           This case is incredibly different.  In this situation

12  Reuters obtained these videos from Stringer with the

13  understanding that they were the December footage -- that they

14  were telling their clients that it was.  It said so on the

15  Stringer web page.  The person who licensed it to Stringer

16  represented that it was the December footage.  Except it

17  wasn't.  It was a snowstorm from November, a month earlier.

18  There was no demand for the November snowstorm footage that

19  Reuters distributed.  This is completely unlike the situation

20  in *Morel*.  Prior to the distribution of these videos by

21  Reuters, Mr. Clement, like I said, sold two licenses and one

22  day rate.  That was it.  His day rate amounted to, I think he

23  got a thousand dollars for a day rate.  It was all the video

24  that he shot that day which included this footage.  And then

25  those two individual licenses where he received $175.  The last

P4L4GLOC

one of those licenses was on November 19th.  There was no

further licensing for an entire month from the day he shot it

and licensed that footage until Reuters distribution.  So this

was not an in-demand photo.  This was not a situation where

people were banging down his door to get these videos.

Now, he may say the December storm footage made people

want the November storm footage also.  I don't know if that's

true or not.  But it certainly wouldn't be all of Reuters

clients knocking down the door trying to get stale footage to

illustrate a December snowstorm.  That's really the main

distinction between what plaintiffs are claiming and reality

here.

Coming back to your question, what is a reasonable

measure of damages?  If Mr. Clement provided evidence that

he -- how about this, that he had clients that were on our

distribution list and thus far we know of maybe 15 to 20

clients where he produced licenses for completely unrelated

footage, where he licensed it to entities that are on our

distribution list.  Maybe he could have possibly licensed it to

those entities.  15 to 20 times 175, we are not talking about

millions of dollars here.  That could be a reasonable measure

of damages.  Again, we don't even have that.

Thus far, the thousand dollar number that Ms. Aragona

mentioned, previously we were under the impression that that

was based off separate unrelated footage from December that he

P4L4GLOC

1   licensed.  It turns out that's not the case.  Apparently, it

2   was based off footage that he never licensed that was available

3   for distribution on Live Storm Media's website, their portal.

4   But they never licensed and never produced a video of them

5   licensing it for a thousand dollars.

6           It's wholly speculative, what the plaintiffs are

7   asking for here, and they acknowledge that.  In deposition

8   testimony Mr. Clement said he had no way of measuring damage

9   here.  He had no idea, and it was impossible for him to measure

10  damages.  Those are exact quotes.

11          THE COURT:  And do you have the citation Judge

12  Nathan's decision?

13          MR. CHASE:  I do.  It is 2014 WL 3963124.  It's

14  August 13, 2014.

15          THE COURT:  Thank you.

16          Ms. Aragona, I'm happy for you to respond to -- let's

17  pick up with the damages first.  And then you can address

18  anything that Mr. Chase said and then any issues you'd like to

19  address on your motions, if you want to.

20          MS. ARAGONA:  Thank you, your Honor.

21          Just some further background as far as the damages go.

22  Mr. Clement was in Buffalo, New York in November 2022, those

23  are the videos that are in issue.  He also flew back in

24  December 2022 for the blizzard that was one of the most extreme

25  weather events that year.  There was zero visibility.  And he

P4L4GLOC

1    believes that he -- because he was there during a time where --

2    it was over Christmas, so a lot of news agencies were not

3    there.  They were working with a skeleton crew.  There was

4    really no one there, like, monitoring what was happening.  So

5    he was capturing this footage.  He was putting it out there to

6    clients, but the news cycle kind of did not start it until a

7    few days later when everyone is coming back from Christmas.  In

8    that time, he is not seeing that the actual blizzard footage is

9    being licensed which is surprising to him because he is there

10   driving through zero visibility, helping people.

11          So when defendants point out in the *Morel* case people

12   wanted hurricane footage that day, I'm not sure when that was,

13   But it doesn't seem like the facts are very different because

14   as soon as there was a demand for it the video, the incorrect

15   video was licensed out to Reuters' customers.

16          Mr. Clement and Global Weather, they are a direct

17   competitor with Reuters.  And Global Weather is a small

18   business.  Reuters has much more resources.

19          We think the facts of *Agence v. Morel* are on point,

20   and it is a question for the jury to determine.  And in that

21   case the Court found that there was enough evidence for the

22   jury to conclude that the copyright owner would have made 1,000

23   sales, roughly the number of customers who obtained the images

24   from the infringing defendants.  There were some other cases

25   that we cited as well, a Second Circuit case, *Stevens Linen*

P4L4GLOC

1    *Assocs., Inc. v. Mastercraft Corp*., 656 F.2d 11, 15 (2d Cir.

2    1981), endorsing a damages theory that would calculate damages

3    by assuming defendants customers would have bought from

4    plaintiff but for defendant's infringement.

5          And also *RSO Records, Inc. v. Peri*, 596 F.Supp. 849,

6    860 (S.D.N.Y. 1984).  "It would be reasonable to assume that

7    for every counterfeit copy of plaintiff's copyright records and

8    tapes sold by defendants, plaintiffs lost a corresponding

9    sale."

10          There is also case law from the Ninth Circuit citing

11    to a Second Circuit decision *On Davis v. Gap, Inc*.  It's a

12    Second Circuit case, that's 246 F.3d 152.

13          And the Ninth Circuit case is *Oracle Corp. v. SAP AG*,

14    that is 765 F.3d 1081.  So we don't -- we disagree that a

15    plaintiff has to show that they would have licensed or could

16    have licensed their works to this number of people.  The case

17    law supports that the jury can assume that for every infringing

18    distribution or sale, the plaintiff would have lost a

19    corresponding sale.

20          THE COURT:  Well, really what you're saying is that

21    you don't dispute that the defense can raise in front of the

22    jury any evidence they want concerning all of the things that

23    Mr. Chase just talked about?

24          MS. ARAGONA:  I think both sides are going to make

25    their positions based on the supporting case law.  And it's for

P4L4GLOC

1  the jury to decide whether or not the amount that plaintiff's

2  entitled to.

3         I just wanted to point out in the *Oracle* case, it

4  says, "we have never required a plaintiff in a copyright

5  infringement case to show that it would have licensed the

6  infringed material.  We decline to impose such a requirement

7  now.  A copyright holder has the right to refuse to license its

8  work.  It should not be penalized for exercising that right."

9  And the outcome, if you were to require the copyright holder to

10  demonstrate that it would have granted a license to all these

11  entities, it would just result in -- if a copyright holder

12  wanted to protect its copyrights -- that's part of the issue in

13  this case.  Global Weather does not permit licensing and usage

14  of video on social media, and it doesn't permit distribution

15  because plaintiff wants to keep exclusivity and protect the

16  value of his work, be able to protect the work, be able to

17  limit the usage or if they want decide to license it.

18         Finally, on *Davis*, which is a Second Circuit case,

19  they state "in our view, between leaving the victim of the

20  illegal taking with nothing and charging the illegal taker with

21  reasonable cost of what he took, the latter, at least in some

22  circumstances, is the preferable solution."

23         THE COURT:  Mr. Chase, if I had to look at one case

24  from your side of the damages issue that supports your view, I

25  understand the *Morel* case, and I've been reading it.  And

P4L4GLOC

1    Ms. Aragona says if you look at that case, it doesn't foreclose

2    the kind of damages award we are looking for here.  But from

3    your perspective, what's the best case?

4              MR. CHASE:  I think in the summary judgment context,

5    I'd say *Baker v. Urban Outfitters*, 254 F.Supp. 2d 346.  I think

6    that case is very helpful to our case.

7              I would also say that *Banff v. Express*, which is an

8    S.D.N.Y. case from 1995, we also cited in our briefing, is a

9    very useful case for that front.  In the *Banff* case, for

10   instance, your Honor, the Court overturned a jury verdict

11   because the infringement was not the but-for cause of

12   plaintiff's damages.  And that's really the test in the Second

13   Circuit.  The *Oracle* case that Ms. Aragona cited isn't anywhere

14   in the papers.  I believe she said it was the Ninth Circuit.

15   But in the Second Circuit it's a but-for test.  And there the

16   jury award a licensee a fee for 40,000 sweaters with Express

17   sold that included Banff's general design.  And the Court

18   looked at the fact that Banff didn't have the capacity to

19   create 40,000 sweaters.  The quality of the sweaters was

20   different.  The price point between Banff and Express didn't

21   align.  And Banff had never done business with Express before.

22   So the Court, even though there were 40,000 infringing sales,

23   the Court said that the infringement of not the but-for cause

24   of the loss.  We would submit it's the same thing here.  That

25   in this case, plaintiff has given no evidence whatsoever that

P4L4GLOC

the infringement was the but-for cause of lost sales in this

circumstances.  Again, there was that month-plus long gap

between his last license and then Reuters mistaken distribution

of the wrong video in December.  And so I would say that those

two cases are probably the most helpful.

THE COURT:  And then on the Rule 26, Rule 37 issue.

MR. CHASE:  Yes.

THE COURT:  What is the prejudice here?  I understand

that no damages calculation was disclosed.  And in your

briefing you said that there was a moving target through

discovery.

MR. CHASE:  Yes.

THE COURT:  But with in what way did that prejudice

your side?  We're here.  You understand the calculation now.

How have you been prejudiced by the failure to produce the

damages calculation?

MR. CHASE:  So we deposed the plaintiff.  And we were

searching for the answers to what their damages were.  We had

asked --

THE COURT:  Remind me when is the first time that you

asked me, if you did ask me, to compel the plaintiff to produce

the Rule 26 disclosure?  You did so in the other case, and I

ordered the plaintiff to do it.

MR. CHASE:  We did not in this circumstances here,

your Honor.  However, we have been chasing the plaintiff down

P4L4GLOC

1   separate and apart from their Rule 26 obligations, we provided

2   plaintiff -- we served plaintiff with an interrogatory asking

3   for exactly the same thing.  When we provided them with the

4   interrogatory, their response was it's premature.  Fine.  We

5   will grant you that.  We haven't produced the list yet.  We

6   understand.  But in November, we brought this up again with

7   them.  And at this point, we were nearing the end of discovery,

8   and we kept getting promised, again and again, we are going do

9   provide it to you.  We are going to provide it to you.  The

10  last date they said they were going to provide it to us was

11  December 4th, nine days before the close of discovery, which we

12  knew was not getting extended again, per your Honor's orders,

13  and also three business days before we were set to depose the

14  plaintiff.  At that point in time, when they blew their own

15  self-imposed deadline to provide us with this information at

16  that point it would have been pretty much futile.  Because we

17  knew we were going to lose the opportunity to depose

18  Mr. Clement, had we pushed off his deposition.  And so it was

19  December 5, even if we had submitted a letter to your Honor

20  seeking an informal conference, plaintiff would have had to

21  respond.  We would have been right up against plaintiff's

22  deposition.  And we wouldn't have had the opportunity.  So

23  that's the reason we didn't previously raise this with your

24  Honor.

25          But as far as the prejudice goes, we had to go through

P4L4GLOC

 1    the deposition without the benefit of knowing what the damages

 2    computation was.  We devoted five pages of our summary judgment

 3    brief to a theory that plaintiff represented to the Court they

 4    were pursuing.  And then apparently they are not pursuing it

 5    with respect to the December footage that they spoke about.

 6    Plaintiff has suggested various categories of damages that

 7    aren't currently in their damages computation but that came up

 8    at his deposition where he said he might later submit them.

 9          Again, this has been -- and we also forewent a damages

10    expert as well because we didn't have a damages computation to

11    attack.

12          So there are all sorts of prejudice to defendants.

13    And having to go back and now allow them to proceed with this

14    damages computation that we haven't tested, absolutely is

15    prejudicial to defendants.

16          THE COURT:  Now, in discovery, did they come close to

17    telling you what damages they were seeking?  Do you get what

18    I'm saying?  You now have this $7 million calculation.  Today,

19    was the first day you had it.  I understand that.  But at some

20    point in time, by way of 30(b)(6) deposition or otherwise, were

21    you not made aware of the general approach that the plaintiff

22    was taking in terms of damages?

23          MR. CHASE:  I would say, to be charitable, I would say

24    a general theory in the sense that we knew that lost sales was

25    general issue they were going for, but we had no back up for

P4L4GLOC

1    that.  The best that we were able to get from the plaintiffs

2    was a settlement communication, which I can't obviously get

3    into here, where they proposed, I don't think it's a secret, a

4    number in the millions.  Again, there is case law in the Second

5    Circuit that settlement communications are not a substitute

6    whatsoever for 26(a)(1) disclosures because all sorts of

7    factors go into that, including litigation expense, avoiding

8    having witnesses testify, avoiding trial.  There's all sorts of

9    other factors that go with it.  That's the best that we've got

10   over the course of this case.

11           During Mr. Clement's serving as a corporate

12   representative for Global Weather during his 30(b)(6)

13   deposition, the vast majority was spent on damages.  And we

14   went through everything from all the different countries that

15   Mr. Clement does not do business in, where our clients happen

16   to reside.  We went through a list of every country where

17   Reuters does business.  And a number of the clients that he's

18   now claiming he lost sales to, he would never do business with

19   companies in those country anyway.  We learned that -- I mean,

20   there is -- to put a point on --

21           THE COURT:  Let me ask this, I hear what you're

22   saying.  In terms of the summary judgment briefing, are there

23   additional arguments that you would raise now that you know

24   what the plaintiff are seeking?

25           MR. CHASE:  I would say there are other species of

P4L4GLOC

1    what we have argued, but, yes, there are additional points we

2    would raise.

3         For example, your Honor, they say there are 1,275

4    downstream clients.  We know for a fact that they are double

5    counting because there is significant overlap between the

6    lists.  It's very clear that what they did is they looked at

7    the last number on the spreadsheet and just totaled them up

8    across all of the spreadsheets.  In reality, it's probably

9    closer to 6 or 700 that are unique clients that received the

10   videos, that's just one example.

11        The thousand dollars number, there's no basis in

12   reality for that number.  Mr. Clement may have posted one of

13   his videos, drone footage, one of six videos at issue, for a

14   thousand dollars.  But he never sold any of them.  He never

15   licensed a single one of those videos that has been produced in

16   discovery.  Now, we would say that the $175 number is the more

17   appropriate number to consider, which is what Mr. Clement -- I

18   should say, we don't even know that it was Mr. Clement.  It was

19   WxChasing, his entity, received $175 for that one video.  And

20   we don't know what expenses WxChasing incurred and what

21   percentage actually made it to Mr. Clement.  Mr. Clement

22   admitted in his deposition that WxChasing has employees.  They

23   have operating expenses.  So of that $175 that he received, we

24   are sure that it's less than that.  But we don't know because

25   he never produced the evidence in support of that to show that

P4L4GLOC

1    he actually received X number of dollars.

2              THE COURT:  Okay.  Understood.

3              Ms. Aragona, I'll give you kind of a last chance to

4    speak on any issue you'd like.

5              MS. ARAGONA:  Thank you, your Honor.  I did want to

6    address the Rule 26 disclosure.  We did provide a breakdown in

7    connection with a settlement discussion.  It was in writing.

8    It was on December 5th.  I also spoke with counsel, I think on

9    the phone maybe the day prior, December 4th or maybe it was the

10   same day, December 5th.  And then during plaintiff's deposition

11   plaintiff specifically testified that he is seeking lost

12   licensing for the number of downstream users.  We produced a

13   plethora of his licensing history from other events, from these

14   events.

15             I think if you read the testimony of Mr. Clement as a

16   30(b)(6) witness he is describing -- in addition to actual

17   damages, lost licensing, the questioning was going into:  What

18   are your damages?  How are you damaged?  And there were

19   difficulties in coming to that determination of what that is

20   because the company earns money through YouTube video

21   advertisements.  Some video footage they put on their YouTube

22   and keep that exclusive to their YouTube.  They earn ad revenue

23   from that, anything taken away from that, that's lost.  The

24   focus, ultimately, was on actual lost licensing because the

25   others were so difficult to establish.  And it's really

P4L4GLOC

1    defendants' self-induced claimed prejudice because we didn't

2    get the lists that we were supposed to get.

3         THE COURT:  Let me ask you a question.  When you get

4    to trial, how are you going to prove up your damages case?  I

5    take it you don't have an expert on damages; right?

6         MS. ARAGONA:  Correct, your Honor.

7         THE COURT:  So how are you going to prove up your case

8    on damages?  Are you going to tell the jury that they you

9    should award your client $7.6 million?  I may not be getting it

10   exactly right, but the number that you stated to me previously.

11        MS. ARAGONA:  Yes, depending on what other discovery

12   comes out, lost licensing times the number of actual downstream

13   licensees that were defendants' customers.

14        THE COURT:  And that's going to be established through

15   who?  Meaning which witness?  Who is the person?

16        MS. ARAGONA:  Mr. Clement, through his licensing,

17   through what he's offered as licensing.  I think there is lost

18   licensing.  And like, I think, the cases support, you can base

19   it on lost licensing or what the fair market value of what a

20   license would have been to that downstream user.  So it's going

21   to be a question for the jury to decide.  What's the actual

22   value of the license to these downstream entities, based on

23   what the plaintiff's licensing history was?  And you know, I

24   think it's just a question for the jury, based on his testimony

25   and then listening to defendants' arguments against that.

P4L4GLOC

1          THE COURT:  All right.

2          MS. ARAGONA:  I did just want to -- I know to begin

3    with, the defendant was discussing their arguments --

4          THE COURT:  I apologize for interrupting.  But when

5    did you the calculation that you told me about, it was the

6    number of downstream user, which is the total number of the

7    people who got the video, essentially.  And then times -- what

8    were the things that it was multiplied by?

9          MS. ARAGONA:  Six videos times the license fee for

10   each video.  Because each video was licensed separately.  So

11   that's $1,000.

12         THE COURT:  And the basis, the evidentiary basis for

13   that thousand dollars is what?

14         MS. ARAGONA:  The licensing that was produced.

15   Mr. Clement has licensed the November footage between 500 and a

16   thousand dollars.  He also licensed his December blizzard

17   footage for $1,000 or more, I believe.

18         THE COURT:  You're saying that during discovery you

19   did tell the defendants -- put aside the settlement

20   discussions -- outside of that it, it would have been clear

21   that what you were seeking was a license fee per number of

22   downloads?

23         MS. ARAGONA:  Yes, your Honor.

24         THE COURT:  And that is reflected in your papers, I

25   assume, in opposition for motion for summary judgment?

P4L4GLOC

MS. ARAGONA:  Yes.  We referenced it in the context of the deposition testimony.

THE COURT:  Meaning in the deposition testimony Mr. Clement said that?

MS. ARAGONA:  Yes.

THE COURT:  Okay.  Now, we'll take the motions under submission.

Mr. Chase, to the extent that you wish to supplement your motion with a five-page supplemental brief by next Friday, you're permitted to do so.  You don't have to.  I'm not going to read anything into your not doing that.  But if there are particular issue that are made apparent by today's disclosure of the Rule 26 damages calculation, you can certainly address those in your motion.

MR. CHASE:  I appreciate that, your Honor.

THE COURT:  Otherwise, we will take the matter under advisement.

Ms. Aragona, anything else that we should address today?

MS. ARAGONA:  If, your Honor, would like me to comment on the representations and warranties that the defendant had been speaking about?

THE COURT:  No, I think I understood that, and I will address it.  I assume you've addressed that in your papers?

MS. ARAGONA:  Yes.

P4L4GLOC

1              THE COURT:  Good.

2              All right.  Mr. Chase, anything from your end?

3              MR. CHASE:  No, your Honor.  I think we covered the

4    big points here.

5              THE COURT:  All right.  Okay.  So we will see if there

6    is another brief that gets submitted.  Otherwise, we will put

7    in an order after this hearing.  And if there is any further

8    issues, the parties can let us know, relating to the Pond5

9    issue or anything else.  Thank you very much.

10             (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25